

AO 91 (REV.5/85) Criminal Complaint                    AUSA Halley B. Guren (312) 886-4156

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

JUL 2 4 2012
Jul 24 2012
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

CASE NUMBER: **12 CR 559**

ANA NERISSA TOLENTINO,
    also known as "Nerie," and
FREDERICK MAGSINO

**UNDER SEAL**

MAGISTRATE JUDGE MASON

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: Beginning no later than in or around January 2011, and continuing to in or around July 2012, in the Northern District of Illinois, Eastern Division, ANA NERISSA TOLENTINO, also known as "Nerie," and FREDERICK MAGSINO, defendants herein:

> did knowingly conspire with each other, and others known and unknown, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in return for the referral of individuals to a person for the furnishing and arranging of the furnishing of services for which payment may be made in whole or in part under Medicare, a Federal healthcare program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2), and in furtherance of and to effect the objects of the conspiracy, (a) on or about March 22, 2012, MAGSINO paid approximately $4,100 to individuals for the referral of Medicare patients to Rosner Home Health Care; and (b) on or about April 19, 2012, TOLENTINO paid approximately $3,900 to individuals for the referral of Medicare patients to Rosner Home Health Care, Inc.;

all in violation of Title 18, United States Code, Section 371.

I further state that I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

        Signature of Complainant
        CARMEN GOMEZ
        Special Agent, HHS-OIG

Sworn to before me and subscribed in my presence,

July 24, 2012        at    Chicago, Illinois
Date             City and State

Michael T. Mason, U.S. Magistrate Judge
Name & Title of Judicial Officer        Signature of Judicial Officer

UNITED STATES DISTRICT COURT            )
                                        )  ss
NORTHERN DISTRICT OF ILLINOIS           )

## AFFIDAVIT

I, CARMEN GOMEZ, being duly sworn, hereby state as follows:

1.      I am a Special Agent of the United States Department of Health and Human Services,
Office of Inspector General ("HHS-OIG") and have been so employed since approximately January
2011.  As an HHS-OIG Special Agent, I investigate, and have received training in the investigation
of, fraud perpetrated against federal health care programs, including Medicare, Medicaid, and private
insurance providers.

2.      This affidavit is submitted in support of a criminal complaint against defendants ANA
NERISSA TOLENTINO, also known as "Nerie," and FREDERICK MAGSINO for conspiring to
commit violations of Title 42, United States Code, Section 1320a-7b(b)(2) (the Anti-Kickback
Statute), all in violation of Title 18, United States Code, Section 371.  As set out in more detail
below, defendants conspired with each other, and others known and unknown, to and pay and offered
and paid illegal kickbacks in the form of cash or checks, for referring Medicare-covered patients to
Rosner Home Healthcare, Inc., a home health care ("HHC") agency, for home health services.
Under Title 42, United States Code, Section 1320a-7b, it is illegal to knowingly and willfully offer
to pay (among others) patients, nurses, and other healthcare workers money or remuneration of any
sort in exchange for the referral of a patient for home health care services for which payment may
be made under Medicare.

3.      Because this affidavit is being submitted for the limited purpose of establishing
probable cause to support the charge described herein, I have not included each and every fact known
to me concerning this investigation.  I have set forth only the facts that I believe are necessary to
establish probable cause to believe that the defendants committed the offense alleged in the

complaint.

4.      The information contained in this Affidavit is based upon my personal training and experience, participation in this investigation, information that I have obtained from other federal law enforcement agents, and information from other sources, including but not limited to witness interviews, consensually recorded conversations, bank and telephone records, Medicare records, and public record databases.

## BACKGROUND

**A.      Summary of Investigation**

5.      Rosner is an HHC agency located in Skokie, Illinois.  According to Illinois Secretary of State records, Rosner is owned by ANA NERISSA TOLENTINO, FREDERICK MAGSINO, and their respective spouses.  According to Secretary of State records, both TOLENTINO and MAGSINO are members of Rosner's board of directors.  TOLENTINO is Rosner's secretary and registered agent, and MAGSINO is Rosner's president.  According to state licensing records, TOLENTINO is also a registered nurse.

6.      According to Medicare provider enrollment records, Rosner has been enrolled as a provider since approximately May 11, 2004, and was assigned a unique provider number under which Rosner uses to submit claims to the Medicare program for reimbursement.  According to claims data maintained by Medicare, between approximately February 2008 and March 2012, Medicare paid Rosner approximately $13,031,295 for claims submitted by Rosner to Medicare for home health services for the period of approximately January 2008 through January 2012.

7.      On behalf of Rosner, TOLENTINO and MAGSINO have paid kickbacks in the form of cash or checks of approximately $300 to $600 to individuals for each patient referred to Rosner for the commencement of an initial episode of Medicare home health care services (defined by

Medicare as a 60-day period) and, in certain circumstances, for the readmission of those patients for continued Medicare home health services through Rosner.

8.      On or about March 14, 2012, a Rosner employee became a cooperating source, hereinafter known as "CS3."[1]  Based on interviews with CS3 and a review of consensual recordings made by CS3 at the direction of law enforcement, from approximately 2009 to July 2012, MAGSINO and TOLENTINO each provided CS3 with the kickbacks in the form of cash and, in payment to one individual, checks, to deliver to the individuals who had referred Medicare patients to Rosner for home health services.  CS3 met with the referring individuals to deliver the kickback payments. On behalf of MAGSINO and TOLENTINO, CS3 maintained and updated a log recording the kickback payments to referring individuals.  On behalf of Rosner, CS3 has recently paid two Illinois-licensed physicians, hereinafter known as "Individual 1" and "Individual 2" approximately $600 and $500, respectively, per patient referred to Rosner.  CS3 has also paid kickbacks for each patient referral to at least four individuals, hereinafter known as "Individual 3," "Individual 4," "Individual 5," and "Individual 6."  CS3 on behalf of Rosner paid Individual 3 and Individual 6 each approximately $600 per referral, and Individual 4 and Individual 5 each approximately $500 per referral.

## B.    The Medicare Program

9.      Based on my training and experience and information I have obtained from other law enforcement agents and from other government agencies, I know the following about the Medicare

---

[1]      CS3 has been employed at Rosner since approximately 2009.  In approximately July 2011, a jury convicted CS3 of mortgage fraud in an unrelated trial at which s/he testified.  Certain statements made by CS3 during his/her testimony were false.  At trial, the government also presented evidence that CS3 did not declare all the income received from the mortgage fraud in his/her tax returns or in a later bankruptcy petition.  CS3 is awaiting sentencing in that case.  CS3 is cooperating in hopes of receiving a reduced penalty with regard to his/her own conduct as it relates to this case and his/her mortgage fraud case.

program:

      a.     HHS administers the Medicare program, which provides free or below-cost health care benefits for, among others, persons aged 65 and older, certain younger people with disabilities, and people with end-stage renal disease. Congress established the Medicare program in 1965 when Congress enacted Title XVII of the Social Security Act. The Medicare program qualifies as a Federal Health Care Program for purposes of 42 U.S.C. § 1320a-7b. *See* 42 U.S.C. § 1320b-7b(f).

      b.     Medicare has several components including Part A (Hospital Insurance) and Part B (Supplemental Medical Insurance). Medicare Part A covers certain expenses of health care services furnished in an institutional setting, such as a hospital or skilled nursing facility, or provided by an HHC agency or hospice. Medicare Part B covers certain physician services. Medicare will reimburse only claims for services that are reasonable, medically necessary, and actually rendered.

      c.     The Centers for Medicare and Medicaid Services ("CMS"), a federal agency within HHS, administers the Medicare program. CMS contracts with public and private organizations, usually health insurance carriers, to process Medicare claims and perform administrative functions. CMS currently contracts with Palmetto GBA to administer and pay Part A claims from the Medicare Trust Fund. The Medicare Trust Fund is a reserve of monies provided by the federal government.

      d.     Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information as required

-4-

by Medicare.

e.     Providers of health care services to Medicare beneficiaries seeking reimbursement under the program must submit a claim form ("HCFA UB92") containing certain required information pertaining to the Medicare beneficiary. The information includes, among other things, the beneficiary's name, health insurance claim number, date and location where the service was rendered, and type and number of services provided. The claim form must also include the procedure code, the International Classification of Diseases, ninth revision ("ICD-9") code reflecting the patient's diagnosis, and the charges for each service provided, as well as the provider's assigned provider number, and a certification that such services were personally rendered by the provider.

f.     Medicare Part A helps pay for medically necessary home health and hospital care. Medicare authorizes payment for home health care only if the care was actually provided and was medically necessary, that is, the services were required because of disease, disability, infirmity, or impairment. Medicare will not pay for services and treatment which were not actually provided or for which the patient did not meet the criteria necessary to justify the claimed service or treatment.

g.     Under Part A, covering home health services, a patient is eligible for coverage only if a patient is "homebound." A patient is homebound when an illness or injury restricts his or her ability to leave his or her place of residence except with the aid of supporting devices, or if s/he has a condition which is such that leaving his or her home is medically contraindicated.

10.     Medicare typically approves home health care for a 60-day period. A 60-day period is referred to as an "episode." An initial episode of home health care is known as a Start

of Care ("SOC"). After the SOC, a patient must be "recertified" by a physician to receive

additional 60-day episodes of home health care. These new episode(s) are known as

"recertifications." Further, if a provider discharges a patient after a cycle or cycles of care, and

later initiates additional cycles of care, the later initiation is referred to as a "readmission."

## C.    The Federal Anti-Kickback Statute

11.    Title 42, United States Code, Section 1320a-7b(b) prohibits health care providers,

including HHC agencies, from offering or paying kickbacks, and prohibits individuals from

soliciting or receiving kickbacks, in exchange for the referral of Medicare and Medicaid patients

or other federally insured beneficiaries. Specifically, the statute provides in pertinent part:

> Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –
>
> in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony . . .
>
> or
>
> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce such person –
> . . .
> to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony . . .

12.    Under the federal Anti-Kickback statute, among other things, it is illegal to

knowingly and willfully offer to pay patients, nurses, and other healthcare workers money or

remuneration of any sort in exchange for the referral of a patient for home health care services for

which payment may be made under Medicare.[2]  The purpose of the federal anti-kickback statute is to ensure that medical decisions are not influenced by financial rewards from third parties and to protect against increased costs to Federal health care programs.

## EVIDENCE ESTABLISHING PROBABLE CAUSE

### A.   Information Obtained from CS3

13.    In interviews with the government beginning on or about March 14, 2012, through approximately June 2012, CS3 provided information regarding Rosner's payment of kickbacks for patient referrals.  A substantial portion of information provided by CS3 has been corroborated by further investigation, including but not limited to CS3's consensual recordings, consensual recordings with another cooperating source, hereinafter identified as CS1,[3] and financial records.

14.    CS3 advised that Rosner was already paying kickbacks to referring individuals for patient referrals when CS3 first began working for Rosner.  Once CS3 began working at Rosner, CS3's main responsibilities entailed paying kickbacks to various referring individuals, including physicians, nurses, and other individuals for patient referrals and keeping track of these referral payments.  According to CS3 and CS1's consensual recordings, Rosner typically waited until the patient completed one episode before paying a referring individual a kickback.  At the time of

---

[2]    Similarly, claims for items or services resulting from a violation of the anti-kickback statute are false claims for purposes of subchapter III of chapter 27 of Title 31.  *See* 42 U.S.C. § 1320a-7b(g).

[3]    CS1 works in the home health care industry and is a former employee of Rosner.  CS1 has provided information to law enforcement since at least 1995.  Between 1995 and 2002, CS1 was paid approximately $8,000 by the government in exchange for CS1's information and assistance.  CS1 was closed as a source in November 2010 because of concerns that s/he had failed to disclose to the government that s/he had been involved in paying kickbacks to home health patients in connection with Rosner prior to the initiation of the investigation.  CS1 was reopened as a source a few months later, after further debriefings, which suggested that the issue had been due to a misunderstanding.  CS1 has no criminal history.

CS3's March 14, 2012 interview, CS3 had been paying physicians Individual 1 and Individual 2, and Individual 3, Individual 4, Individual 5, and Individual 6 (hereinafter collectively called "referring individual(s)"), among others. Rosner owner TOLENTINO primarily provided CS3 with cash for the kickback payments, and on occasion, Rosner owner MAGSINO provided CS3 with cash for the kickbacks. CS3 obtained checks from TOLENTINO for the kickbacks to Individual 4 made payable to Individual 4's company, hereinafter "Company 1."

15. According to CS3 and corroborated by consensual recordings, CS3 kept track of the referral kickbacks through an excel spreadsheet that CS3 created. CS3 advised agents that CS3 maintained a worksheet tab for each individual receiving kickbacks from Rosner for patient referrals. CS3 described that s/he included on the spreadsheet both patient referrals and kickback payments that s/he has made, as well as payments that TOLENTINO told CS3 that Rosner had made to individuals. According to CS3, before receiving cash from TOLENTINO to pay a kickback to referring individuals, CS3 printed out the page of the spreadsheet for that particular referring individual and provided the spreadsheet to TOLENTINO. CS3 advised that TOLENTINO marked the page of the spreadsheet. CS3 believed that CS3 saw TOLENTINO write the amount of the kickback on the spreadsheet. TOLENTINO did not return the spreadsheet page to CS3. TOLENTINO handed CS3 the cash for the kickback payments. CS3 advised that s/he took the cash to his/her office, where CS3 typically placed the cash in an envelope with a thank you card for the referring individual. On the inside of the card, CS3 usually listed the names of the patient or patients for whom the referring individual was receiving a kickback payment. CS3 advised that when a stack of cash was too big for the thank you card envelope, CS3 used a larger envelope without a "thank you card" and usually included a document that listed the names of the patient or patients for whom the referring individual was

receiving the kickback payments. CS3 advised that CS3 arranged to meet with a referring individual either in CS3's office or at another location, where CS3 provided the referring individual with the envelope containing the cash payment. With regard to Individual 4, CS3 stated that CS3 sometimes gave Individual 4 a check made payable to Company 1 in an envelope. CS3 further advised that Individual 3 at times directed CS3 to deposit cash payments into Individual 3's bank account at J.P. Morgan Chase Bank, which the CS3 then typically deposited.

16.     Beginning on or about approximately March 15, 2012, until on or about July 20, 2012, at the direction of agents, CS3 made consensual recordings using audio and video recording devices with TOLENTINO, MAGSINO, and the referring individuals regarding the payment of kickbacks.[4] CS3 confirmed that, for each consensually recorded kickback payment for a patient referral during the period of CS3's cooperation with law enforcement, Rosner treated the referred patient, and preliminary claims data from Medicare corroborated that Rosner submitted claims for almost all patients. Unless otherwise stated in the affidavit, for each consensually recorded meeting, CS3 met with the agents at a pre-designated location before the meeting. Before each recorded meeting, agents searched CS3's person for contraband and money. Agents also searched CS3's car when CS3 used his/her car for a consensually recorded meeting. Each time the agents searched CS3's person and car, the result was negative for contraband. The agents took note of the amount of money that CS3 had on his/her person and in CS3's car. Agents equipped CS3 with audio and video recording devices and activated the devices. Agents maintained surveillance on CS3 as CS3 either entered the building where the

_____

[4]     On or about June 14, 2012, due to the nature of one of the audio and video recording devices, the audio and video recording device turned off. According to CS3, CS3 felt the device vibrate and noticed that the recording device had turned off. CS3 then contacted agents, returned the device, and received another device. At all times, at least one audio or audio and video recording device captured the entirety of the exchange.

meeting was occurring or met with the individual at an outside location. Agents monitored the majority of the consensual recordings. After the meetings, CS3 met the agents at pre-designated locations, at which time the agents deactivated and took possession of the audio and video recording devices. With the exception of the consensual recording on or about March 15, 2012,[5] the agents again searched CS3 and his/her car for contraband, and each time the result was negative. Agents additionally counted the money on CS3's person and in his/her car, and confirmed that the amount was the same as before the meeting. On occasion, CS3 had a lesser amount on his/her person. On those occasions, CS3 told agents the reason for the lesser amount. Reasons included paying for parking or buying lunch before meeting at a pre-designated location. In addition, CS3 made consensually recorded telephone calls with certain referring individuals using a recording device controlled by law enforcement.

**B.     CS3's Consensual Recordings**

**1.     Individual 1**

17.     In an interview on or about March 14, 2012, CS3 stated that a Rosner employee was already paying Individual 1 for patient referrals at the time CS3 started working at Rosner. CS3 stated that CS3 paid Individual 1 cash kickbacks of approximately $600 for each patient he referred and each patient's readmission. CS3 advised that CS3 made payments to Individual 1 approximately once a week or once every other week at Individual 1's house in Skokie, Illinois.

---

[5]     On or about March 15, 2012, CS3 obtained approximately $1,100 from Rosner owner MAGSINO. On that occasion, law enforcement searched CS3 before CS3 obtained the cash. After CS3 obtained the cash, law enforcement followed CS3 from Rosner to Chase Bank in Skokie, Illinois. Law enforcement counted and photographed the cash and accompanied CS3 as he/she deposited $600 into Individual 3's bank account. Law enforcement allowed CS3 to retain the remaining $500 for Individual 5 to be paid the next day. On or about March 16, 2012, law enforcement again photographed the cash for Individual 5 and recorded the payment to Individual 5.

CS3 advised that CS3 paid Individual 1 for patients at their Start of Care date and also for patient readmissions. According to CS3 and CS1's consensual recordings, Rosner typically waited until the patient completed one episode before paying a referring individual a kickback. Based on the Medicare Claims Processing Manual, an HHC agency qualifies for a full episode payment if the HHC agency sees a patient five or more times within that episode of care. If there are four or fewer visits, the HHC agency will receive a low-utilization payment adjustment (LUPA) of a predetermined per-visit amount for each of the visits rendered instead of the full episode amount.

18.     Beginning on or about March 23, 2012, and continuing through June 14, 2012, at the direction of agents, CS3 consensually recorded approximately six meetings with Individual 1 and paid him approximately $4,800 in cash for patient referrals to Rosner. Below is a summary of the kickback payments to Individual 1:

| Date Paid | Amount Paid | Number of Patients |
|-----------|-------------|--------------------|
| 3/23/2012 | $600 | 1 |
| 3/30/2012 | $600 | 1 |
| 4/6/2012 | $600 | 1 |
| 4/19/2012 | $1,200 | 2 |
| 5/3/2012 | $600 | 1 |
| 6/14/2012 | $1,200 | 2 |
| **TOTAL** | **$4,800** | **8** |

19.     *Individual 1 - March 23, 2012 meeting*. On or about March 22, 2012, at the direction of agents, CS3 consensually recorded a meeting with Rosner owner MAGSINO in MAGSINO's office at Rosner. Agents maintained surveillance of CS3 while CS3 entered Rosner. During the meeting, MAGSINO provided CS3 with approximately $4,100 in cash, a portion of which included approximately $600 cash for kickback payments to Individual 1 for one patient referral. Following the meeting, agents met CS3 at a pre-designated location, and agents photographed the $600 cash, an envelope prepared by CS3 with "[Individual 1]" written

on the front, and a thank you card with the name of the referred patient written on the inside of the card.

20.     On or about March 23, 2012, at approximately 11:13 a.m., in anticipation of a scheduled meeting between CS3 and Individual 1 at Individual 1's residence, CS3 met with agents at a pre-designated meeting location. Agents provided CS3 with the $600 cash of which agents had taken custody the day before. Law enforcement maintained surveillance of CS3 while CS3 entered Individual 1's residence. As described below, during the meeting with Individual 1, CS3 paid Individual 1 $600 for the referral of one patient.

21.     Based on my review of the audio/video recordings, a later debriefing of CS3 and surveillance, the following occurred during the meeting with Individual 1 on or about March 23, 2012.[6] CS3 entered the residence of Individual 1, identified through law enforcement databases and the Illinois Secretary of State as Individual 1's address. CS3 handed to Individual 1 a brown envelope with documents for Individual 1 to sign. CS3 had advised agents, before meeting with Individual 1, that the documents were Medicare forms for patient care. Individual 1 signed the documents from the brown envelope. While Individual 1 signed the documents, CS3 passed a

---

[6]     The recorded conversations throughout this affidavit have been summarized and quoted. The content of the conversations are preliminary and not final transcriptions of the consensually recorded phone calls. In addition, the voice identifications for the recordings are preliminary. In most cases, identifications are based on names used during the recorded conversations, information from CS3, voice recognition that has been accomplished to date by law enforcement officers, comparisons of the video recording of the individual's face to driver's license photographs, cellular phone records, and historical information developed during the investigation. The times listed for these conversations are approximate. The summaries below do not include all statements or topics covered during the course of the consensually recorded conversations. At various points in the Affidavit, I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from CS1 and CS3, the contents and context of the recorded conversation, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

white envelope across the table in front of Individual 1. CS3 stated to Individual 1, "This is for [patient name]." Individual 1 responded, "Okay." According to CS3, Rosner treated the referred patient, and preliminary Medicare claims data corroborated that Rosner submitted a claim for the patient.

### 2.    Individual 2

22.    In the interview on or about March 14, 2012, CS3 stated that CS3 recruited Individual 2 to Rosner as a referring source. CS3 advised that CS3 had met Individual 2 at a home health care agency at which CS3 had worked before coming to Rosner. After leaving that agency, CS3 contacted Individual 2 and asked Individual 2 to start referring patients to Rosner. According to CS3, Individual 2 has received as a kickback approximately $500 per patient referral from Rosner since CS3 began working at Rosner. Like with Individual 1, CS3 advised that CS3 paid Individual 2 for patients at the patient's Start of Care date.

23.    Beginning on or about March 30, 2012, and continuing through June 28, 2012, CS3 recorded approximately three meetings with Individual 2, paying Individual 2 approximately $1,500 in cash for patient referrals to Rosner. Below is a summary of the kickback payments to Individual 2:

| Date Paid | Amount Paid | Number of Patients |
|-----------|-------------|--------------------|
| 3/30/2012 | $500 | 1 |
| 5/10/2012 | $500 | 1 |
| 6/28/2012 | $500 | 1 |
| **TOTAL:** | **$1,500** | **3** |

24.    ***Individual 2 - March 30, 2012 meeting***.  On or about March 30, 2012, at the direction of and in the presence of agents, CS3 consensually recorded a meeting with MAGSINO in MAGSINO's office at Rosner, during which MAGSINO provided CS3 with approximately $1,100 in cash, a portion of which included approximately $500 cash for Individual 2 for one

patient referral. Following the meeting, CS3 met with agents at a pre-designated location and provided agents with the $500 cash, an envelope prepared by CS3 with "[Individual 2]" written on the front, and a thank you card with the following written on the inside of the card, "Thank you for readmission of [patient name]." Agents photographed the cash, envelope and card.

25.     At approximately 2:42 p.m., that same day, agents met with CS3 at a pre-designated location. Agents provided CS3 with the $500 cash, the envelope, and the card. Law enforcement maintained surveillance of CS3 while CS3 entered Individual 2's office. As described below, during the meeting with Individual 2, CS3 paid Individual 2 $500 for the referral of the patient.

26.     Based on the audio/video recording, a later debriefing of CS3 and surveillance, the following occurred on or about March 30, 2012, at the meeting with Individual 2. CS3 entered the building where Individual 2's office was located. After a brief wait, Individual 2 met CS3 in the waiting room area, telling CS3, "Come on in." After a brief conversation, CS3 stated, "This is for you," and handed Individual 2 a bag with cake in it, which s/he had bought for Individual 2 and his office staff. Later in the conversation, CS3 stated, "Uh Uh, we uh, readmitted uh [patient first name]." Individual 2 asked, "Who?" CS3 responded by stating the patient's last name. CS3 then handed an envelope to Individual 2. Individual 2 stated, "Oh okay." After CS3 stated, "Thank you," Individual 2 asked, "Nobody else?" CS3 responded, "That's it." CS3 left the building and met agents at a pre-designated location. According to CS3, Rosner treated the referred patient, and preliminary Medicare claims data corroborated that Rosner submitted a claim for the patient.

**3.     Individual 3**

27.     In interviews on or about March 14, 2012, and on or about July 12, 2012, CS3

advised that CS3 had met Individual 3 in approximately 2009 after hearing about Individual 3 through another individual to whom CS3 paid kickbacks on behalf of Rosner for patient referrals. According to CS3, Individual 3, TOLENTINO and CS3 met in approximately 2009 to negotiate the amount of the kickback Individual 3 was to receive for each patient referral. At the meeting and in CS3 and TOLENTINO's presence, Individual 3 asked to be paid $700 per patient referral. By the end of the meeting, TOLENTINO agreed to pay Individual 3 $600 for each patient referral. CS3 advised that CS3 paid kickbacks to Individual 3 approximately once a week since approximately August 2009. According to CS3, CS3 used to pay Individual 3 at the time Individual 3 referred the patient to Rosner. TOLENTINO and MAGSINO changed this procedure, and now Individual 3 along with most referring individuals were paid after the completion of five patient visits.

28. At the direction of law enforcement, CS3 consensually recorded approximately 15 meetings with Individual 3 at which CS3 paid Individual 3 for patient referrals. During this time, CS3 paid Individual 3 approximately $24,000 in kickbacks in the form of cash or bank deposits into Individual 3's account. In addition, CS3 used a recording tool controlled by law enforcement to record telephone calls with Individual 3, during which CS3 and Individual 3 usually arranged the logistics for payments. Below is a summary of the kickback payments to Individual 3:

| Date Paid | Amount Paid | Number of Patients |
|---|---|---|
| 3/15/2012 | $600 | 1 |
| 3/22/2012 | $1,800 | 3 |
| 3/29/2012 | $1,800 | 3 |
| 4/5/2012 | $1,800 | 3 |
| 4/12/2012 | $1,800 | 3 |
| 4/19/2012 | $1,200 | 2 |
| 4/26/2012 | $2,400 | 4 |
| 5/3/2012 | $1,200 | 2 |
| 5/17/2012 | $2,400 | 4 |
| 5/25/2012 | $1,200 | 2 |
| 5/31/2012 | $600 | 1 |
| 6/7/2012 | $2,400 | 4 |
| 6/14/2012 | $1,200 | 2 |
| 6/21/2012 | $1,200 | 2 |
| 6/28/2012 | $1,200 | 2 |
| 7/12/2012 | $1,200 | 2 |
| **TOTAL:** | **$24,000** | **40** |

29.     *Individual 3 - March 22, 2012 meeting.* On or about March 22, 2012, at the

direction of agents, CS3 consensually recorded a meeting with MAGSINO in MAGSINO's

office at Rosner, at which MAGSINO provided CS3 with approximately $4,100 in cash, a

portion of which included approximately $1,800 cash for kickback payments to Individual 3 for

the referral of three patients. Based on preliminary draft translated summaries of the

consensually recorded conversation in Tagalog between MAGSINO and CS3, MAGSINO gave

directions as to divide the $4,100 cash among four referring individuals, including specifying that

$1,800 should go to Individual 3. Agents maintained surveillance of CS3 as CS3 entered Rosner.

30.     Following the meeting, CS3 met agents at a pre-designated location. Agents

photographed the approximately $1,800 cash, an envelope prepared by CS3 with "[Individual 3]"

written on the front, and an untitled typed list of three patient names. At approximately 12:45

p.m. that same day, CS3 met with agents at a pre-designated meeting location. Agents provided

CS3 with the approximately $1,800 cash, along with the envelope and the untitled list of patients.

Law enforcement observed CS3 meeting with Individual 3 outside of Individual 3's residence. As described below, during the meeting with Individual 3, CS3 paid Individual 3 $1,800 cash for the referral of the three patients.

31.     Based on my review of the audio/video recording, a later debriefing of CS3, and surveillance, the following occurred on or about March 22, 2012, at the meeting with Individual 3. CS3 parked in front of a residence located in Chicago, Illinois, identified as Individual 3's through law enforcement databases. CS3 met Individual 3 outside of CS3's vehicle. CS3 retrieved from CS3's vehicle an envelope, on which "[Individual 3]" in writing on the front was visible. During the conversation, Individual 3 opened a white plastic Eddie Bauer bag, which he then extended towards CS3. CS3 then placed the envelope in the bag. Individual 3 pulled the bag back towards him. Following CS3's handing of the envelope to Individual 3, CS3 and Individual 3 talked about Individual 3's "client list." Based on my training and experience and my knowledge of the investigation and a debriefing with CS3, I understand the "client list" to be a list of patients whom Individual 3 has referred to CS3. After the meeting, CS3 met agents at a pre-designated location. According to CS3, Rosner treated the referred patients, and preliminary Medicare claims data corroborated that Rosner submitted a claim for the patients.

### 4.     Individual 4

32.     In an interview with law enforcement on or about April 3, 2012, CS3 advised that CS3 met Individual 4 through Individual 3. According to CS3, CS3 first talked to Individual 4 in approximately late 2010, using Individual 3's phone and while meeting with Individual 3. Individual 3 requested CS3 pay Individual 4 $500 per patient referral and pay Individual 3 an additional $100 per patient referral in exchange for Individual 3 introducing Individual 4 to CS3.

33.     According to CS3, Individual 4 had told CS3 that she went by a nickname and

that she owned a referral agency named Company 1. Agents were unable to locate Company 1 as

a registered company with the State of Illinois, Secretary of State. CS3 advised that until

approximately the end of 2011, Rosner had paid Individual 4 $500 per patient referral with

Individual 3 receiving an additional $100 for each of Individual 4's patient referrals. CS3 further

advised that sometime between approximately the end of 2011 and February 2012, Individual 4

called CS3 and informed him/her that Individual 4 had negotiated a better deal with another

home health agency. Individual 4 also requested more timely payments from Rosner. According

to CS3, MAGSINO and TOLENTINO met with Individual 4 and agreed to pay Individual 4 in a

more timely fashion in exchange for her continued referrals. TOLENTINO told CS3 about the

meeting with Individual 4 on the day it occurred. At that time, TOLENTINO instructed CS3 to

stop the additional payments to Individual 3 for Individual 4's referrals. TOLENTINO told CS3

that Rosner's bookkeeper advised TOLENTINO to pay Individual 4 $1,000 per pay period

through her company, Company 1, in exchange for two patient referrals. According to CS3, the

bookkeeper further advised that any additional patient referrals over the two referrals covered by

the check were to be paid in cash. According to CS3, Rosner paid Company 1 approximately

$1000 each month by check, with "marketing expenses" sometimes listed on the bottom of a

business check. Despite the regular payment of $1,000 per month, Rosner did not pay Individual

4 a monthly salary but instead paid Individual 4 a kickback for each patient she referred to

Rosner, as evidenced by consensual recordings with Individual 4, including the consensual

recording described in paragraph 38, and debriefings with CS3.

34.     Beginning on or about March 23, 2012, and continuing through June 21, 2012, at

the direction of agents, CS3 consensually recorded approximately eight in-person meetings,

along with multiple telephone calls with Individual 4, in which s/he paid or arranged to pay Individual 4 approximately $13,500 in cash and checks for patient referrals. Below is a summary of the kickback payments to Individual 4:

| Date Paid | Amount Paid | Number of Patients |
|---|---|---|
| 3/23/2012 | $1,000 | 2 |
| 4/6/2012 | $2,500 | 5 |
| 4/12/2012 | $3,500 | 7 |
| 4/19/2012 | $1,000 | 2 |
| 5/3/2012 | $1,500 | 3 |
| 5/17/2012 | $1,500 | 3 |
| 5/31/2012 | $1,500 | 3 |
| 6/21/2012 | $1,000 | 2 |
| TOTAL: | $13,500 | 27 |

35.     *Individual 4 - May 17, 2012.*  On or about May 17, 2012, at the direction of and in the presence of agents, CS3 consensually recorded a meeting with TOLENTINO in her office at Rosner, at which TOLENTINO provided CS3 with approximately $4,400 in cash, a portion of which included approximately $500 cash for a kickback payment to Individual 4, along with a $1,000 check made payable to Company 1, for three patient referrals. Agents maintained surveillance of CS3 while CS3 entered Rosner for the meeting. Following the meeting with TOLENTINO, CS3 met with agents at a pre-designated location, at which time CS3 provided the agents with, among other things, the $500 cash, an envelope prepared by CS3 with "[Individual 4's nickname]" written on the front, a patient list which included information regarding referral dates and start of care dates. CS3 anticipated receiving a check payable to Company 1 for $1,000 later that day from TOLENTINO. Agents photographed the cash, patient list, and envelope. Upon review of the audio/video recording, the $1,000 check referenced by CS3 is visible during the meeting with Individual 4 and TOLENTINO in TOLENTINO's office.

36.     Later that day, at approximately 2:43 p.m., CS3 met agents at a pre-designated

location. Agents provided CS3 with the $500 cash, the patient list, and envelope, of which agents had previously taken custody. Law enforcement maintained surveillance of CS3 while CS3 met with Individual 4 and TOLENTINO at Rosner. As described below, during the meeting with Individual 4 and TOLENTINO, CS3 paid Individual 4 $500 cash and a $1,000 check as kickbacks for the referral of the three patients.

37.     Based on the audio/video recording, a later debriefing of CS3 and surveillance, the following occurred on or about May 17, 2012, at the meeting with Individual 4. CS3 met with Individual 4 and TOLENTINO in TOLENTINO's Rosner office. Individual 4 had already been given the check for Company 1 for $1,000. CS3 entered TOLENTINO's office and gave Individual 4 the envelope, patient list, and cash. The recording showed Individual 4 appearing to review the patient list. During the review, TOLENTINO and Individual 4 discussed a particular patient Individual 4 referred to ROSNER. TOLENTINO stated that the patient was discharged and Individual 4 responded that "[Patient name] was picked back up." TOLENTINO responded, "[Patient name], he was admitted, uh, 4/11." CS3 stated, "Uh, ok it didn't go through my desk....[patient name], it didn't go through my desk. I only find out if they have been admitted, if I get the referral." Individual 4, showed on the recording reviewing the patient list, stated, "And here, it reads 7/22." In TOLENTINO's presence, Individual 4 handed CS3 the patient list, and CS3 responded, "[Patient name]. Okay, well, we paid you for it, on May 3. [Patient name]." Individual 4 responded, "Oh, okay." CS3 repeated, "We paid you for him already." Agents photographed Individual 4 leaving Rosner with white documents in her hand. CS3 later met agents at a pre-designated location. According to CS3, Rosner treated the referred patients, and preliminary Medicare claims data corroborated that Rosner submitted a claim for the patients.

### 5.    Individual 5

38.    In an interview with law enforcement agents on or about March 27, 2012, CS3 stated that MAGSINO and another individual to whom CS3 paid kickbacks for patient referrals, hereinafter "Individual 7," introduced CS3 to Individual 5.  MAGSINO informed CS3 that Individual 5 was to be taking over the patient referrals to Rosner for Individual 7.  MAGSINO told CS3 to pay both Individual 5 and Individual 7 a total of $500 for each patient referral. Following this meeting, Individual 5 called either CS3 or MAGSINO's son to provide the patient referrals.

39.    Beginning on or about March 16, 2012, and continuing through June 14, 2012, at the direction of agents, CS3 consensually recorded approximately four meetings and numerous telephonic conversations with Individual 5, paying Individual 5 approximately a total of $3,000 in cash for patient referrals on each occasion.  Below is a summary of the kickback payments to Individual 5 for patient referrals:

| Date Paid | Amount Paid | Number of Patients |
|---|---|---|
| 3/16/2012 | $500 | 1 |
| 4/19/2012 | $1,500 | 3 |
| 5/17/2012 | $500 | 1 |
| 6/14/2012 | $500 | 1 |
| **TOTAL:** | **$3,000** | **6** |

40.    *Individual 5 - April 19, 2012 meeting*.  On or about April 19, 2012, at the direction of agents, CS3 consensually recorded a meeting with TOLENTINO in TOLENTINO's office in Rosner, at which TOLENTINO provided CS3 with approximately $3,900 in cash, including approximately $1,500 cash for Individual 5 for three patient referrals, and a check for

$1,000.[7] Based on preliminary draft translated summaries of the conversation between TOLENTINO and CS3 in the language Tagalog, TOLENTINO and CS3 discussed the payments. TOLENTINO asked CS3 for the total amount of payments. CS3 informed TOLENTINO that $1,500 was for "[Individual 5's first name]," $1,200 was for "Dr. [Individual 1's last name]," $1,200 was for "[Individual 3's first name]," and $1,000 is for "[Individual 4's self-identified nickname]." Agents maintained surveillance of CS3 as CS3 entered Rosner.

41. Following the meeting, CS3 met agents at a pre-designated location. Agents took custody of the kickback payments provided by TOLENTINO to CS3. Agents photographed the $1,500 cash, an envelope prepared by CS3 with "[Individual 5]" written on the front, and an untitled typed list of three patient names.

42. That same day at approximately 11:16 a.m., agents met CS3 at a pre-designated location. Agents provided CS3 with the $1,500 cash, the envelope, and an untitled patient list, of which they had previously taken custody. Law enforcement observed CS3 meet with Individual 5 in the patient drop-off area of Mount Sinai Hospital in Chicago. Individual 5 remained in her vehicle while speaking with CS3. As described below, during the meeting with Individual 5, CS3 paid Individual 5 $1,500 cash for the referral of the three patients.

43. Based on the audio/video recording, a later debriefing of CS3, and surveillance, the following occurred on or about April 19, 2012, at the meeting with Individual 5. Individual 5 arrived in a white Hyundai Santa Fe at the patient drop off area of Mount Sinai, where CS3 was

---

[7] Agents also took custody of the cash for Individual 1 and Individual 3, photographed this cash, and consensually recorded and monitored CS3's payment of the remaining cash. With regard to the check, CS3 marked the check number for the check to Company 1, but agents were not able to photograph the check because Individual 4 picked up the check that day from Rosner before CS3 was able to bring the check to the agents to be photographed.

waiting. Agents have previously entered the license plate for the Hyundai Santa Fe into a database, and the vehicle was registered to Individual 5. According to the consensual recording, CS3 stated to Individual 5, "This is for three people," and handed a white envelope to Individual 5. Individual 5 responded, "Okay." After the meeting, CS3 met agents at a pre-designated location. According to CS3, Rosner treated the referred patients, and preliminary Medicare claims data corroborated that Rosner submitted a claim for the patients.

### 6.    Individual 6

44.    In an interview with law enforcement on or about March 30, 2012, CS3 stated that Individual 6 knew Individual 3 and called CS3 directly in order to personally arrange to get paid for patient referrals with Rosner. CS3 advised that CS3 met with Individual 6 at a Chicago restaurant. At that meeting, Individual 6 requested $600 per patient referral and per patient readmission. CS3 met with TOLENTINO and a coconspirator about Individual 6' request. A Rosner coconspirator stated that if Individual 6 provided enough patients, Individual 6 would receive gifts. At the meeting, TOLENTINO and the Rosner coconspirator approved paying Individual 6 $600 per patient referral.

45.    Beginning on or about March 22, 2012, and continuing through July 12, 2012, at the direction of and in the presence of agents, CS3 consensually recorded approximately four meetings and numerous telephonic conversations with Individual 6, paying Individual 6 approximately $4,800 in cash for patient referrals. Below is a summary of the kickback payments to Individual 6 for patient referrals:

| Date Paid | Amount Paid | Number of Patients |
|---|---|---|
| 3/22/2012 | $1,200 | 2 |
| 5/3/2012 | $600 | 1 |
| 5/25/2012 | $1,200 | 2 |
| 6/28/2012 | $600 | 1 |
| 7/12/2012 | $1,200 | 2 |
| **TOTAL:** | **$4,800** | **8** |

46.     *Individual 6 - March 22, 2012 meeting*.  On or about March 22, 2012, at the

direction of agents, CS3 consensually recorded a meeting with MAGSINO in MAGSINO's

office at Rosner, at which MAGSINO provided CS3 with approximately $4,100 in cash, a

portion of which included approximately $1,200 cash for Individual 6 for two patient referrals, as

previously described in paragraph 29.  Based on preliminary draft translated summaries of the

consensually recorded conversation in Tagalog between MAGSINO and CS3, MAGSINO gave

directions as to divide the $4,100 cash among four referring individuals, including the $1,200

designated for Individual 6.  Agents maintained surveillance of CS3 as CS3 entered Rosner.

Following the meeting, CS3 met agents at a pre-designated location.  Agents took custody of the

kickback payments provided to CS3 by MAGSINO.  Agents photographed the $1,200 cash, an

envelope prepared by CS3 with "[Individual 6]" written on the front, and an untitled typed list of

two patient names.

47.     That same day, at approximately 12:14 p.m., agents met CS3 at a pre-designated

location.  Agents provided CS3 with the $1,200 cash and the envelope and card, of which they

had previously taken custody.  Law enforcement maintained surveillance of CS3 while CS3

consensually recorded a meeting with Individual 6 in the parking lot of a Shell gas station.  As

described below, during the meeting with Individual 6, CS3 paid Individual 6 $1,200 cash for the

referral of the two patients.

48.     Based on the audio/video recording, a later debriefing of CS3, and surveillance, the following occurred on or about March 22, 2012, at the meeting with Individual 6.  CS3 parked his/her vehicle at the Shell gas station parking lot.  Individual 6 approached CS3 on foot. CS3 held a white envelope, on which "[Individual 6]" was visible in writing on the front.  CS3 stated, "This is for two people," and handed the envelope to Individual 6.  Individual 6 responded, "Okay."  CS3 then stated, "Uh, the, that's with uh... [patient name] and uh...[patient name]."  After the meeting, CS3 met agents at a pre-designated location.  According to CS3, Rosner treated the referred patients, and preliminary Medicare claims data corroborated that Rosner submitted a claim for the patients.

## CONCLUSION

49.     Based on the foregoing, there is probable cause to believe that ANA NERISSA

TOLENTINO, also known as "Nerie," and FREDERICK MAGSINO violated Title 18, United

States Code, Section 371, in that the defendants conspired with each other and others known and

unknown to knowingly and willfully offered and paid remuneration, directly and indirectly,

overtly and covertly, in return for referring individuals to a person for the furnishing and

arranging for the furnishing of services for which payment may be made in whole and in part

under Medicare, a Federal healthcare program, in violation of Title 42, United States Code,

Section 1320a-7b(b)(2), all in violation of Title 18, United States Code, Section 371.

FURTHER AFFIANT SAYETH NOT

CARMEN E. GOMEZ,
Special Agent
U.S. Department of Health & Human Services
Office of Inspector General


Subscribed and sworn
before me this 24th day of July, 2012

Honorable Michael T. Mason
United States Magistrate Judge